**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NONNA SOROKINA,<br><br>Plaintiff,<br><br>v.<br><br>THE COLLEGE OF NEW JERSEY,<br><br>Defendant. | Civil Action No. 19-20674 (RK) (JBD)<br><br>**MEMORANDUM OPINION** |

**KIRSCH, District Judge**

**THIS MATTER** comes before the Court upon Plaintiff Nonna Sorokina's ("Plaintiff") Motion for Judgment Notwithstanding the Verdict (hereinafter referred to as a "Motion for Judgment as a Matter of Law")[1] under Federal Rule of Civil Procedure 50(b), or in the alternative, for a New Trial under Federal Rule of Civil Procedure 59(a). ("Motion," ECF No. 221.) The Court has considered the parties' submissions and resolves the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Plaintiff's Motion is **DENIED**.

## I. OVERVIEW

As will be set forth in greater detail below, the Court provides a summary as follows: Plaintiff, then an Assistant Professor employed by Defendant, The College of New Jersey ("Defendant" or "TCNJ"), sought and was denied reappointment and was given a year's notice to

---

[1] *See* Fed. R. Civ. P. 50(a) advisory committee's note to 1991 amendment ("If a motion is denominated a motion for directed verdict or for judgment notwithstanding the verdict, the party's error is merely formal. Such a motion should be treated as a motion for judgment as a matter of law in accordance with this rule.").

seek alternative employment. With no lag in employment, Plaintiff obtained a faculty position at Penn State University, where she remains to date.

In November 2019, Plaintiff filed the instant lawsuit against Defendant claiming that the non-renewal of her employment contract was motivated by unlawful discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), based on her gender, national origin, pregnancy, and in retaliation for her claims of discrimination. (*See* ECF No. 1.) Ultimately, in August 2026, the matter was tried before a jury on her claims of gender discrimination and retaliation.[2]

The trial spanned six (6) days and consisted of fifteen (15) witnesses. Each side presented both fact and expert witnesses, and at trial, the Court admitted dozens of exhibits. After the Court provided the legal instructions to the jury, and after forty-one (41) minutes of deliberations, the jury returned a No Cause verdict in favor of Defendant on all counts.

In Plaintiff's subject motion seeking judgment as a matter of law and/or for a new trial, Plaintiff argues that: (1) the Court was biased against her and/or her counsel, who is Plaintiff's husband, and thus should have recused itself *sua sponte*; and (2) the Court should overturn the jury's verdict and enter judgment in her favor on the basis that there was sufficient evidence adduced to support both her claims of gender discrimination and retaliation. Both bases fail.

Plaintiff's claims of bias and an appearance of a lack of impartiality are belied by the record. Although Plaintiff had some seven (7) years to prepare for trial, a cursory review of the trial transcript regrettably makes plain that Plaintiff's counsel was woefully and inexcusably unprepared, disorganized, and unduly repetitive. Before, during, and after trial, Plaintiff's counsel

[2] After the close of discovery, the court granted TCNJ's motion for summary judgment on all claims. (ECF No. 114.) The Third Circuit affirmed in-part and reversed in-part, reinstating solely the gender and retaliation claims. (ECF No. 134.)

repeatedly failed to comply with court orders, the Federal Rules of Civil Procedure, and the Federal Rules of Evidence.

In truth, the Court went to great lengths to patiently attempt to assist Plaintiff's counsel, and to attempt to ensure that his constant state of disorganization did not inure to the detriment of his client in the eyes of the factfinder—the jury. For example, which will be explained in greater detail below, the Court repeatedly provided its own hard copies of Plaintiff's exhibits to witnesses on the stand in the middle of testifying, because, even though ordered by the Court to do so, Plaintiff continually failed to bring hard copies for witnesses, causing unnecessary and avoidable delays. Additionally, the Court sustained numerous objections made by Plaintiff's counsel and ruled in Plaintiff's favor when appropriate. To be sure, on the only significant dispute between the parties regarding proposed jury instructions, the Court ruled in Plaintiff's favor—over Defendant's objection—by providing the cat's paw instruction, which was critical to Plaintiff's theory of the case.

As to Plaintiff's renewed request for judgment as a matter of law under Federal Rule of Civil Procedure ("Rule") 50(b), the Court notes the following: while Plaintiff makes a passing reference to the correct legal standard—that the Court "must draw all reasonable inferences in favor of the nonmoving party" without "mak[ing] credibility determinations"—she, in fact, wholly disregards that standard by asking this Court reweigh the entirety of the evidence adduced at trial, and to do so in the light most favorable to *her*. (ECF No. 277 at 21 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).) As set forth herein and in the record, there was ample evidence adduced at trial to support the jury's verdict—certainly not a record so "critically deficient" as to render the jury's verdict "[ir]rational." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 268 (3d Cir. 2012). Similarly, as to Plaintiff's request for a new trial under Rule 59(a), based

on the evidence adduced at trial, the jury's verdict is no "miscarriage of justice" and does not "shock [the] conscience." *Grazier ex rel. White v. City of Philadelphia*, 328 F.3d 120, 128 (3d Cir. 2003). Accordingly, as set forth below, Plaintiff's Motion shall be denied.

## II. BACKGROUND

### A. PROCEDURAL BACKGROUND

The case was tried to a jury from August 24 to August 31, 2026.[3] After both parties rested, both moved for judgment as a matter of law pursuant to Rule 50(a). (ECF Nos. 208, 210.) The Court reserved on both motions. (*See* ECF No. 218.) After closing arguments, the Court provided the final instructions to the jury, which commenced deliberations at 12:39 p.m. (Day 5 Trial Tr. at 242:19–44:3, 154:14–15; Day 6 Trial Tr. at 23:16–38:9; ECF No. 213.) At 1:20 p.m., as stated, the jury returned a unanimous verdict of "No Cause" on Plaintiff's gender discrimination and retaliation claims in favor of TCNJ. (ECF Nos. 213, 217.) All eight jurors were polled and independently affirmed their agreement with the verdict of "No Cause" in favor of TCNJ. (Day 6 Trial Tr. at 99:12–102:3.) Two days after the jury was discharged, on September 2, the Court denied the parties' pending cross motions for judgment as a matter of law under Rule 50(a). (ECF No. 218.) The Court entered final judgment in favor of Defendant on September 8, 2026. (ECF No. 219.)

On September 28, 2026, Plaintiff submitted a post-trial filing, consisting of two paragraphs, entitled, "Plaintiff's Motion for Judgment Notwithstanding the Verdict or New Trial." (Motion.) No brief accompanied this filing. (*See id.*) On October 9, 2026, Plaintiff filed a brief in support of her September 28 filing. (ECF No. 225.) Plaintiff's October 9 filing is beyond the 28-day post-

---

[3] The trial transcripts for each day are cited as follows: August 24, 2026 Trial Transcript, ("Day 1 Trial Tr."); August 25, 2026 Trial Transcript, ("Day 2 Trial Tr."); August 26, 2026 Trial Transcript, ("Day 3 Trial Tr."); August 27, 2026 Trial Transcript, ("Day 4 Trial Tr."); August 28, 2026 Trial Transcript, ("Day 5 Trial Tr."); and August 31, 2026 Trial Transcript, ("Day 6 Trial Tr.").

judgment time requirement. *See* Fed. R. Civ. P. 50(b) ("[N]o later than 28 days after the jury was discharged . . . the movant may file a renewed motion for judgment as a matter of law . . . ."); *see also* Fed. R. Civ. P. 59(b) ("A motion for a new trial must be filed no later than 28 days after the entry of judgment."). Plaintiff argues, *inter alia*, that she is entitled to judgment as a matter of law under Rule 50(b) because the evidence adduced at trial of gender discrimination and retaliation was "sufficiently strong that judgment should be entered in her favor on liability for both claims." (ECF No. 225 at 13.) As for her alternative basis under Rule 59(a),[4] she argues that this Court was obligated to recuse itself *sua sponte* under 28 U.S.C. § 455(a) for personal bias against her and her counsel, and thus by failing to so recuse, she should be afforded a new trial on both of her Title VII claims. (*Id.* at 3–12.) On October 23, without leave of Court, Plaintiff filed another opening brief. (ECF No. 227.) Compared to her prior filing, Plaintiff's subsequent brief is nine pages longer, expands on her prior arguments, and contains various other substantive, typographical, and formatting changes. (*Compare* ECF No. 225, *with* ECF No. 227.) Defendant timely filed its opposition on November 2, 2026. (ECF No. 228.) Plaintiff did not reply.

### B. Factual Background

In the Fall of 2016, Plaintiff began a position as a tenure-track Assistant Professor in the finance department of TCNJ. (ECF No. 129 at 5.) While her classes were limited to the undergraduate school, in the Summer and Fall of 2018, she participated with other faculty in helping to create an MBA graduate school program. (*Id.* at 5–6.) After disagreements with fellow

---

[4] Plaintiff's post-trial filing characterizes the relief sought as a request for judgment as a matter of law under Rule 50(b) and frames her request for a new trial under Rule 59(a) in the alternative. (*See* Motion at 1.) In Plaintiff's subsequent briefing, however, she characterizes her request for a new trial as the primary relief sought and describes her request for judgment as a matter of law in the alternative. (*See* ECF No. 225 at 12; ECF No. 227 at 21.) While this distinction is immaterial to the Court's decision, the Court treats Plaintiff's request for judgment as a matter of law under Rule 50(b) as the primary relief sought and her request for a new trial under Rule 59(a) as an alternative request, which is reflected in the structure of the Court's foregoing analysis.

faculty members, however, she was removed from the MBA program by the interim dean. (*Id.*) Plaintiff subsequently filed a formal complaint with TCNJ on November 15, 2018, alleging various members of the department created a "hostile work environment." (*Id.* at 9.) TCNJ later investigated and found no merit to her complaint, after which Plaintiff filed a charge with the EEOC in Spring 2019 alleging retaliation, sex, and national origin discrimination. (*Id.*)

At around the same time, Plaintiff applied for reappointment to her position for a fifth and sixth year. (*Id.* at 7.) In short, the reappointment process at TCNJ entails a four-level faculty performance review: first, by a three-member Department Promotion and Reappointment Committee ("PRC"); second, by a Dean-level faculty member; third, by a Provost-level faculty member; and finally, by TCNJ's President. (*See id.* at 6–7 (discussing TCNJ's reappointment and promotions policy).) Each reviewing faculty member or members submit their recommendation to the next level of review until it ultimately reaches the President. (*Id.*) The President, in turn, provides a final recommendation to the Board of Trustees, which typically adopts the President's recommendation. (*Id.* at 7.)

In Plaintiff's case, the sitting PRC faculty members included Dr. Herbert Mayo, Dr. Thomas Patrick, and Dr. Susan Hume. (*Id.*) The PRC ultimately declined to recommend Plaintiff for reappointment, although only two faculty members—Dr. Patrick and Dr. Mayo—signed the PRC report, with Dr. Hume declining to do so. (*Id.* at 7–8.) The PRC then submitted its report to Dr. Jane Wong, Dean of the School of Humanities and Social Science, who conducted her own independent evaluation and likewise declined to recommend Plaintiff for reappointment. (*Id.* at 8.) Continuing along with the review process, Dr. Wong submitted her report and recommendation to Dr. David Blake, Interim Vice Provost for Faculty and Academic Planning, who after reviewing the submitted materials, concluded that Plaintiff should not be reappointed. (*Id.* at 8–9.) Dr. Blake

then provided his recommendation to Dr. Kathryn A. Foster, TCNJ's President, who upon review of Plaintiff's application and each level of evaluation, independently concluded that Plaintiff should not be renewed and recommended that the Board of Trustees deny Plaintiff's reappointment application. (*Id.*) On President Foster's recommendation, the Board decided not to renew Plaintiff's employment at TCNJ. (*Id.* at 9.) TCNJ faculty members Dr. Patrick, Dr. Hume, Dr. Wong, Dr. Blake, and Dr. Foster testified at trial.

## III. LEGAL STANDARD

When a court denies a party's motion for judgment as a matter of law under Rule 50(a) and a jury thereafter renders a verdict against that party, Rule 50(b) states that party "may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). Such a motion must be filed "[n]o later than 28 days after entry of the judgment." *Id.*; *see also* Fed. R. Civ. P. 59(b) ("A motion for a new trial must be filed no later than 28 days after the entry of judgment"). "A court must not extend the time to act under Rules 50(b) and . . . 59(b)." Fed. R. Civ. P. 6(b)(2).

### A. Rule 50(b)

A renewed motion for judgment as a matter of law under Rule 50(b) may be granted "only if . . . the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." *Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 249 (3d Cir. 2001) (cleaned up)); *see ZF Meritor*, 696 F.3d at 268 ("Underlying legal questions aside, a jury verdict will not be overturned unless the record is critically deficient of that quantum of evidence from which a jury could have rationally reached its verdict." (cleaned up)). When reviewing a Rule 50(b) motion following a jury verdict, the Court must "view[] the evidence in the light most favorable to the nonmovant and giv[e] it the advantage of every fair and reasonable

inference." *Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 433 (3d Cir. 2009) (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)). "In performing this narrow inquiry," the Court is prohibited "from weighing the evidence, determining the credibility of witnesses, or substituting [its] own version of the facts for that of the jury." *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007). The Third Circuit has "cautioned that a court should grant judgment as a matter of law 'sparingly.'" *Pitts v. Delaware*, 646 F.3d 151, 155 (3d Cir. 2011) (quoting *Johnson v. Campbell*, 332 F.3d 199, 204 (3d Cir. 2003)).

### B. RULE 59(A)

A motion for new trial is governed by Rule 59(a), which provides in pertinent part that the "court may, on motion, grant a new trial on some or all of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). The Third Circuit has instructed that a new trial should only be granted when "the great weight of the evidence cuts against the verdict and . . . a miscarriage of justice would result if the verdict were to stand." *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 386 (3d Cir. 2016) (citing *Springer v. Henry*, 435 F.3d 268, 274 (3rd Cir. 2006)); *see also Grazier*, 328 F.3d at 128 ("[N]ew trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience.") (quoting *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1352–53 (3d Cir. 1991)). The decision of whether to grant a new trial is committed to the sound discretion of the district court. *Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d 1002, 1017 (3d Cir. 1995); *see also Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980) (the authority to grant new trial committed almost entirely to discretion of trial court);

*Montgomery Cnty. v. Microvote Corp.*, 320 F.3d 440, 445 (3d Cir. 2003) (a district court's decision on a motion for a new trial is reviewed for abuse of discretion).

## IV. DISCUSSION

### A. RULE 50(B) MOTION FOR JUDGMENT AS A MATTER OF LAW

Plaintiff's renewed motion for judgment as a matter of law under Rule 50(b) is without merit. The parties tried this case for over a week, during which time they presented evidence, conducted direct and cross examinations of witnesses—including eleven fact witnesses and four expert witnesses—and offered competing explanations as to why TCNJ declined to reappoint Plaintiff to her position. In addition, some 32 exhibits were admitted into evidence throughout trial. Armed with this evidence, it took the jury 41 minutes to reach a verdict of "No Cause" on both counts. (ECF Nos. 213, 217.) No reasonable person could conclude from this record that the jury lacked a sufficient evidentiary basis to reach its verdict.

The TCNJ faculty members involved in Plaintiff's reappointment decision testified at length about the structure of the multi-level review process. Dr. Wong, who served as the Dean-level reviewer, explained that the three main criteria to be considered by the reviewers are "teaching, scholarship/creative work, and service." (Day 2 Trial Tr. at 56:8–9.) Testimony from TCNJ faculty established, and Plaintiff did not contest, that teaching is the most important criterion. (*See id.* at 56:11–12 (DR. WONG: "Teaching at TCNJ is by far . . . the most important criteria"), 71:9–10 (DR. WONG: "[I]f teaching was deemed not satisfactory for reappointment . . . the evaluation of the other two criteria become irrelevant"); Day 5 Trial Tr. at 27:24–25 (DR. BLAKE: "[T]eaching is really our bread and butter. It's why students come to TCNJ."), 117:21–24 (DR. FOSTER: "Teaching is a really important part of this application. . . . You have to be a great teacher at TCNJ to get reappointed").)

From this premise, considerable testimony was adduced from the TCNJ faculty reviewers that, among other things, Plaintiff's teaching shortcomings were the reason for her non-renewal, as opposed to her gender or the fact that she previously filed a workplace grievance alleging a hostile work environment. (*See id.* at 28:7–10 (DR. BLAKE: "[Plaintiff] had missed a lot of classes, the ark of [her] teaching career . . . wasn't improving after . . . . [s]everal years of coaching. And so that gave me a lot of concern."), 117:5–18:23 (DEFENDANT'S COUNSEL: "Could you explain for the jury what your concerns about [Plaintiff's] teaching was?" DR. FOSTER: "So probably three areas of concern. One was the performance in teaching itself. . . . [T]he second sort of area that concerned me . . . [was] the trajectory . . . And the third area . . . was the responses by [Plaintiff] to what had been substantive comments . . . . she had responded quite dismissively").) Additionally, many of these same witnesses testified that Plaintiff struggled to cultivate healthy professional relationships with her fellow faculty members, which could further support an inference that Plaintiff's shortcomings on the "service" criterion contributed to TCNJ's non-renewal decision. (*See id.* at 29:16–17 (DR. BLAKE: "[T]he record of teaching and service is inconsistent and raised a lot of concerns for me.") 32:7–10 (DR. BLAKE: "[T]here was a lot of unprofessional behavior, which you could sort of lump under the category of reliability here in terms of getting along with others. And so in that way, I determined that her service was inadequate."), 119:14–20:9 (DR. FOSTER: "[I]t is called for in the promotions document that you are a good citizen of your department, that you . . . have productive working relationships in your department . . . . And in that area, [Plaintiff's] working relationships were not there.").)

The testimony adduced from witness after witness demonstrates that the record is not "critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." *Trabal*, 269 F.3d at 249 (quoting *Powell v. J.T. Posey Co.*, 766 F.2d 131, 133–34

(3d Cir. 1985)). Indeed, after giving nonmovant Defendant "the advantage of every fair and reasonable inference," *Lightning Lube*, 4 F.3d at 1166, and "disregard[ing] all evidence favorable to the moving party that the jury is not required to believe," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000), Plaintiff falls measurably short of demonstrating she is entitled to judgment as a matter of law under Rule 50(b). The jury was entitled to credit the testifying faculty members' non-discriminatory explanations for TCNJ's non-renewal decision, which it did, and this Court is without authority to disturb that conclusion. *See United States v. Caraballo-Rodriguez*, 726 F.3d 418, 432 (3d Cir. 2013) ("It is up to the jury—not the district court judge or [Circuit] Court—to examine the evidence and draw inferences. Unless the jury's conclusion is irrational, it must be upheld."). Plaintiff's attempts to highlight the evidence adduced at trial she believes was favorable to her position does nothing to undermine the sufficiency of the evidence supporting the jury's verdict, but rather amounts to an impermissible invitation to reweigh the evidence in her favor. (*See* ECF No. 227 at 22–29.) Because the Court may not overturn a jury verdict supported by ample evidence, it must decline.

### B. RULE 59(A) MOTION FOR NEW TRIAL

In the alternative, Plaintiff moves for a new trial under Rule 59(a) on grounds that this Court should have recused itself for bias against her and her counsel under 28 U.S.C. § 455(a) ("Section 455(a)"). (ECF No. 227 at 3–21.) Section 455(a) requires a judge to recuse "in any proceeding in which his impartiality might reasonably be questioned." (*See id.* at 3 (quoting 28 U.S.C. § 455(a)).) To this end, Plaintiff points to a myriad of interactions between the Court and her counsel which she claims triggered the Court's *sua sponte* recusal duty under Section 455(a). As stated previously, Plaintiff's contrived allegations of bias are belied by the trial record. While the Court will not endeavor to address each allegation of bias Plaintiff has plucked from the

record—be it out of context or by way of sheer misrepresentation—the Court will cite a number of examples to demonstrate that the true and accurate record renders any allegation of bias meritless.

### 1. Pretrial Events

The lynchpin of Plaintiff's bias claim centers on the Court's handling of her counsel's lunch accommodation request in the weeks preceding trial, which the Court summarizes below.

On July 6, 2026, Plaintiff filed a letter requesting that the Court alter its trial schedule by extending the allotted time for lunch from 20 minutes to one hour. (ECF No. 169 at 1.) The proffered reason for this request, the letter explained, was due to her counsel's "health-related dietary restrictions," which required that he have "sufficient time to obtain and consume a hot meal during the trial day." (*Id.* at 2.) Expanding on this request during a July 21, 2026 teleconference with the Court, Plaintiff's counsel explained that he "ha[s] to have hot lunch" because of his "acidity," albeit without offering or providing any information or medical documentation supporting his unspecified, purported medical condition. ("July 21, 2026 Tr.," ECF No. 175 at 9:17–20.) The Court, in an attempt to balance the need for the efficient progression of trial with the needs of Plaintiff's counsel, offered him "unlimited bathroom breaks within reason" and further agreed to "accommodate a 25-minute lunch break." (*Id.* at 9:21–25.) Plaintiff's counsel did not raise any other concerns regarding the allotted break during this call. (*See id.* at 14:5–6 (THE COURT: "Anything else from the plaintiff?" PLAINTIFF'S COUNSEL: "No, your honor.").)

On August 13, 2026, four days before the final pretrial conference, Plaintiff petitioned the Third Circuit for a writ of mandamus seeking, *inter alia*, a stay of all trial proceedings and an opportunity to fully brief whether the Court should be recused for alleged bias against her and her counsel. (ECF No. 189; ECF No. 189-1 at 7); *In re Nonna Sorokina*, No. 26-3073 (3d Cir. Aug.

14, 2026). In this mandamus petition to the Third Circuit, Plaintiff, shifting sands, now raised that the Court's prescribed lunch break "substantially burden[ed] counsel's observance as an Orthodox Jew" by preventing his performance of "religious rituals associated with intake of food." (ECF No. 189-1 at 2.)[5] At no time in the many years and multitude of appearances before the three Magistrate Judges and three U.S. District Court Judges who have been assigned this case, did Plaintiff's counsel ever raise issues regarding his religion whatsoever. (*See* ECF No. 190 at 2.)

Notwithstanding that the Court previously extended the allotted break to accommodate counsel's stomach acidity, (ECF No. 175 at 9:21–25), and further failing to advise the Circuit in this submission that he at no time raised any religious accommodation request with the Court, (*see id.* at 14:5–6), Plaintiff argued that the Court's handling of the request evinced "a clear appearance of a personal bias against Plaintiff and her counsel," (ECF No. 189-1 at 3). Plaintiff further requested that this Court stay all trial proceedings while the Third Circuit considered her mandamus petition, (ECF No. 189-1 at 7). The following day, this Court issued a letter order denying Plaintiff's request to stay the trial and rejecting "[a]ny suggestion that the Court's trial schedule in this case reflect[ed] bias of any kind" towards her or her counsel.[6] (ECF No. 190. at 1–2.)

Before the Third Circuit addressed Plaintiff's mandamus petition, the issue of the lunch break arose during the August 17, 2026 final pretrial conference. ("Aug. 17, 2026 Tr." ECF No. 228-2.) There, Plaintiff's counsel advised that he had "tested the food intake" timing and determined that "[he] would probably need approximately 22 to 28 minutes" to eat, complete any

[5] As before, Plaintiff also cited her counsel's unspecified and unsupported "health condition" in her mandamus petition. (ECF No. 189-1 at 2.)

[6] The Court further explained in this order that the function of its daily trial schedule—which the undersigned has used without issue in every jury trial as a federal judge—is to "maximize an efficient trial day, particularly for the convenience of jurors, who are asked to juggle their many difficult work, family, and life obligations." (ECF No. 190. at 1–2.)

religious observances associated therewith, and attend to any health-related matters. (*Id.* at 73:1–10.) In response, the Court agreed to extend the lunch break to 30 minutes and further permitted Plaintiff's counsel to eat lunch in the courtroom, if he preferred. (*Id.* at 73:11–19 (THE COURT: "The lunch will now be extended to 30 minutes. You can eat your lunch in the courtroom if you wish. . . ." PLAINTIFF'S COUNSEL: "Thank you, your Honor.").)

On August 20, 2026, the Third Circuit denied Plaintiff's petition without prejudice "to allow the District Court to consider Plaintiff's counsel's religious based objections" to the allotted lunch break. *In re: Nonna Sorokina*, No. 26-3073, ECF No. 6 (3d Cir. Aug. 20, 2026). Although the Court believed that this matter had been resolved, the issue of the lunch break—somehow defying resolution—arose again during a teleconference that same day, with Plaintiff's counsel expressing to the Court that the 30-minute lunch timing was "going to be tight." (Aug. 20, 2026 Tr. at 12:4–6.) Accordingly, the Court agreed to further extend the lunch break to 35 minutes. (*Id.*) Hoping to lay this matter finally to rest, the Court asked counsel whether this allotted time was sufficient for him to address any "health issues, . . . digestive/gastro issues, and . . . religious observation requirements," to which counsel responded that he "really appreciate[d] it," (*id.* at 12:9–16), and advised the Court that "35 minutes . . . should be more than enough[ time]. You satisfy my requirements," (*id.* at 13:7–9). The matter concluded with the following exchange:

> PLAINTIFF'S COUNSEL: I appreciate the judge's civility with this. After the hearing on Monday, I understood where the judge was coming from, and actually I appreciate the shorter day. And I didn't argue with the Court about the shorter day or any other considerations, sole practitioner and stuff like that. I really appreciate that. The only thing I was asking for was an extended break and I got that, and I really appreciate that.
>
> . . . .With that said, I'm totally -- I'm hundred percent satisfied with what the Court has proposed and decided.
>
> THE COURT: I'm glad you are. The work of a trial is hard enough on the lawyers. This, I view, as ancillary and distracting, and my goal is to make sure that this is a

> fair trial to both sides. And we don't need any frolic and detours, and I'm happy to have accommodated you[.]
>
> . . . . And so in light of the fact that the circuit has asked me to weigh on in this . . . . I'm duty-bound as a lower court to respond to the circuit court's request. And I will be memorializing [this] in a very brief . . . letter order, and I will be quoting from today's transcript indicating that you are a hundred percent satisfied, and there is no aspect as it relates to the religious-based objections and the stay of the trial with which the plaintiff is proceeding with at this point. Is that accurate, sir?
>
> PLAINTIFF'S COUNSEL: Yes, your Honor.

(*Id.* at 15:19–17:1.) The Court shortly thereafter issued a letter order memorializing this resolution and advising that the issue underlying the mandamus petition was "fully resolved consistent with the Third Circuit's Order." (ECF No. 198.)

Against this backdrop, there is no merit to Plaintiff's claim that the Court's handling of her counsel's accommodation request evinced any level of bias which would require the Court's *sua sponte* recusal under Section 455(a). Indeed, having taken Plaintiff's counsel at his word when he represented that his medical, religious, and other needs were "[one] hundred percent satisfied [by] what the Court . . . proposed and decided" on Thursday, August 20, 2026, (Aug. 20, 2026 Tr. at 16:6–7), the Court finds it remarkable that Plaintiff now claims the Court's obligation to recuse itself "became unavoidable as of Friday, August 21, 2026," (ECF No. 227 at 10). Such a facially contradictory position is not only meritless, it is frivolous.[7]

Further, the Court rejects Plaintiff's related argument that the mere existence of the mandamus petition accusing the Court of bias somehow created or contributed to an appearance

[7] The Court's belief that its accommodations to counsel put to rest any allegations of religious insensitivity appeared premature. Not only did counsel thank the Court and indicate on the record that he was "[one] hundred percent satisfied," (Aug. 20, 2026 Tr. at 15:19–17:1), but at a sidebar, he advised the Court that his Kippah—a traditional Jewish skullcap—flew off his head en route to the courthouse, prompting him to ask whether he could borrow the Court's Kippah, (Day 5 Trial Tr. at 104:20–23). Yet, in the instant briefing, Plaintiff's counsel appears to revive his claim of the Court's supposed religious insensitivities, so the reprieve on this point proved short-lived. (ECF No. 227 at 5–10.) This whiplash, make-it-up-as-you-go *modus operandi* underscores Plaintiff's overall scattershot approach.

of a lack of impartiality necessitating recusal. (ECF No. 227 at 10.) Contrary to Plaintiff's assertions, "[t]he weight of authority is against compelling recusal merely by attacking a judge," *United States v. Eisenberg*, 734 F. Supp. 1137, 1166 (D.N.J. 1990) (collecting cases), as doing so would cede to litigants the authority to remove judges at their discretion, *see Martin v. Townsend*, No. 90-2616, 1990 WL 138551, at *3 (D.N.J. Sept. 19, 1990) ("[E]ach judge must be alert to avoid the possibility that those who would question his impartiality are in fact seeking to avoid the consequences of his expected adverse decision." (cleaned up)). Accordingly, the Court cannot sanction Plaintiff's claim that her mandamus petition, *ex proprio vigore*, created an objective appearance of bias requiring this Court's recusal. *See United Rentals (N. Am.), Inc. v. Liberty Mut. Fire Ins. Co.*, 744 F. Supp. 3d 333, 339 (D.N.J. 2024) (Chesler, J.) ("A judge is as much obliged not to recuse himself when it is not called for as he is obliged to when it is." (cleaned up)); *see also FDIC v. Sweeney*, 136 F.3d 216, 219 (1st Cir. 1998) (per curiam) ("A party cannot force disqualification by attacking the judge and then claim[] that these attacks must have caused the judge to be biased." (cleaned up)).

**2. Plaintiff's Marital Relationship With Her Counsel**

Another contrived claim of a lack of impartiality is that the Court placed a "repeated and undue emphasis on the marital relationship between Plaintiff and her counsel," thereby "inviting the jury to evaluate Plaintiff's case through the lens of her marital relationship rather than the evidence presented." (ECF No. 227 at 15–16 n.4.) This, too, is baseless.

The Court acknowledged the marital relationship twice: first during jury selection at the outset of trial, (*see* August 24, 2026 Voir Dire Transcript at 37:25–38:2), and second during a line of questioning where Plaintiff's counsel referred to himself in the third person while asking a question to his wife, the witness, about his own deposition transcript, which was highly confusing

for the jury (and the Court itself), (*see* Trial Day 5 Tr. at 183:16–25). These clarifications were not only entirely within the Court's discretion, but they were also *expressly agreed to by Plaintiff's counsel* prior to trial during a teleconference on August 20, 2026. ("Aug. 20, 2026 Tr.," ECF No. 228-3 at 16:6–13 (THE COURT: "I will have to educate the jury that plaintiff's counsel is the plaintiff's husband . . . . That can't be sprung on the jury at the time the defense wants to utilize . . . [his] deposition testimony. I assume you [both] agree with that?" DEFENDANT'S COUNSEL: "Yes, your Honor." PLAINTIFF'S COUNSEL: "Yes, your Honor.").) More to the point, the notion that this Court "invit[ed] the jury" to view this case through the lens of their marital relationship borders on the absurd. (ECF No. 227 at 15–16 n.4.) Plaintiff, and no one else, made this trial a family affair by appointing her husband as lead counsel and even calling her daughter to testify at trial. (*See* ECF No. 185-6 at 4–5.) Insofar as Plaintiff believes the attention drawn to the relationship between her and her family members detracted from her case, she is the architect of her own plight. In any event, the record is devoid of any evidence of bias or appearance of partiality.

**3. Plaintiff's Opening Statement**

Plaintiff next claims that the Court's *sua sponte* interruption of her counsel's opening statement evinced a clear bias against her. (ECF No. 227 at 13–15.) As before, the record reveals the meritless nature of this allegation.

Partway into Plaintiff's opening statement before the jury, the Court interjected after observing that a slide in Plaintiff's demonstrative slideshow made a reference to the case's procedural history. (Day 1 Trial Tr. at 68:4–6.) In particular, the Court noticed the slide "indicate[d] that the Court dismissed the lawsuit and that it was reversed by a higher court," thereby reinstating the sex discrimination and retaliation claims then before the jury. (*Id.* at 68:8–

16.) Upon seeing this slide, the Court promptly directed that the opening statement be paused, the improper slide be taken off the screen, and that the lawyers meet the Court at a sidebar. (*Id.*) At the sidebar, out of earshot of the jury, the Court explained to Plaintiff's counsel the impropriety of presenting the jury with a sanitized procedural history of the case, in particular, that this Court's dismissal of the subject lawsuit *en toto* and the Third Circuit's reinstatement would improperly invite the jury to conclude this Court, and critically, a higher court, had views on the merits of the case, thereby risking influencing their exclusive fact-finding role. (*Id.* at 69:1–11 (THE COURT: "What an appellate court does or doesn't do to instruct a lower court as a legal determination has absolutely no basis. . . . This is not a bench action where the Court is skilled to ferret out the admissible and the not admissible."), 70:7–11 (THE COURT: "[A]dvising the jury of the decision of the district court based on its interpretation of the law and then the Circuit Court's decision affirming and reversing is wholly inappropriate. You may not adduce that.").)

By way of curative measures, the Court prohibited Plaintiff's counsel from showing the particular slide or referencing the procedural history of the case. (*Id.* at 70:22–71:4.) Additionally, since counsel had not yet verbally addressed the portion of the slide referencing the procedural history of the case, the Court further instructed the jury to ignore anything on the screen that was not discussed. (*Id.* at 71:2–73:17). The Court did not otherwise truncate or prevent counsel from completing his opening statement,[8] nor did it preclude him from utilizing other slides or

---

[8] While the Court endeavored to maintain the efficiency of trial proceedings, it at no point directed counsel to expedite, truncate, or shorten the presentation of its case. Just the opposite, the Court repeatedly emphasized that Plaintiff's counsel was under no limitation with respect to the time required to present this case. (*See, e.g.*, Day 2 Trial Tr. at 150:13–22 (THE COURT: "There's no time constraints . . . . [O]f course, in every trial, we try to move the case as expeditiously and as fairly as possible. But you should be under no pressure, because I'm giving you no pressure, in terms of [conducting] a fulsome inquiry of this gentleman and any other witness. . . . [Y]ou take whatever time you need." PLAINTIFF'S COUNSEL: "Appreciate it, Judge. Thank you."), 184:8–9 (THE COURT: "Take your time, however much time you need."); *see also, e.g.*, Day 3 Trial Tr. at 107:10–24 (PLAINTIFF'S COUNSEL: "For the sake of expediting

demonstratives. (*Id.*) When the jury was later excused for the day, the Court, for the benefit of Plaintiff's counsel, cited multiple decisions from other federal courts exemplifying the principle explained at the sidebar—*i.e.*, that discussing a court's legal decision on a matter to a jury creates an unacceptable risk that those jurors will abdicate their role as the fact-finder in deference to that authority. (*Id.* at 149:22–50:23 (THE COURT: "District courts must [assiduously] guard juries against the siren song of irrelevant and prejudicial prior determinations." (quoting *Arlio v. Lively*, 474 F.3d 46, 53 (2d Cir. 2007)); *see id.* at 150:5–23 (discussing *White v. Kroger Ltd. P'ship II*, No. 08-1735, 2011 WL 2551418 (S.D. Ind. June 27, 2011), *Bell v. Bryant*, No. 08-0456, 2012 WL 3028106 (W.D. Mo. July 24, 2012), and *Wheeler v. Lynn*, 10-966, 2012 WL 2994270 (W.D. Mo. July 20, 2012)).)

Plaintiff claims the Court's intervention was without justification, arguing the cited cases are factually distinguishable and non-precedential, and thus the Court's decision to exclude all reference to the case's procedural history was in error. (ECF No. 227 at 13–14.) Plaintiff obviously misses the point. The Court cited the series of cases to illustrate that the introduction of prior pretrial rulings is irrelevant, prejudicial, or both. *See Arlio*, 474 F.3d at 52–53 (finding testimony from prior arbitration proceeding "both irrelevant and overly prejudicial" under Federal Rules of Evidence 401 and 403); *see id.* at 53 ("[T]he jury might have felt a strong compulsion to conform their verdict to the conclusion of the Arbitration Board experts. . . . The allure of a prior expert adjudication must be strong for a jury." (cleaned up)); *White*, 2011 WL 2551418, at *2 ("The Court believes that the [Arbitration] Opinion could confuse the jury and erroneously allow them to conclude that an adverse ruling in the arbitration proceeding is suggestive of unlawful conduct in

---

proceeding, I'll withdraw the presentation of this [exhibit] . . . ." THE COURT: "That's your strategic choice. I want to be clear, I'm not truncating at all your redirect examination. . . . I just want the record to be clear about this. It's your decision to move on. . . . I'm not directing that. Understood?" PLAINTIFF'S COUNSEL: "Understood, yes.").)

the current lawsuit"); *Wheeler*, 2012 WL 2994270, at *2 ("The Court notes its previous rulings are legal determinations which are irrelevant to the issues the jury will be asked to decide. Consequently, the parties shall not make any reference to the Court's previous rulings or orders."); *Bell*, 2012 WL 3028106, at *2 ("[P]revious rulings issued in this case are legal determinations which are irrelevant to the issues the jury will be asked to decide. Consequently, no party shall make any reference to the Court's previous rulings or orders, including the Eighth Circuit Court of Appeals decision reversing a . . . summary judgment ruling."). While no additional discussion of the caselaw is warranted, the Court notes that the evidentiary ruling did not affect counsel's opening statement in any material way or prejudice Plaintiff in any regard.

**4. Other Trial Proceedings**

Plaintiff also complains that the Court "interrupted . . . Plaintiff's examination[s] to require that the witness receive a physical copy of the multipage document," thereby implementing a "strategy of distracting the jury from important evidence . . . in critical moments." (ECF No. 227 at 18.) What Plaintiff describes as a strategy targeted against her or her counsel, however, is more aptly characterized as the Court's "ordinary efforts at courtroom administration." *Liteky v. United States*, 510 U.S. 540, 556 (1994); *Butt v. United Brd. of Carpenters & Joiners of Am.*, 999 F.3d 882, 891 (3d Cir. 2021) ("A judge's ordinary efforts at courtroom administration are immune from a recusal challenge" (cleaned up)).

While the Court need not recount the entirety of the trial record, the following exchange in the opening minutes of Plaintiff's first direct examination is exemplary of the type of interruption she apparently believes reflected a targeted "strategy" of distracting the jury:

THE COURT: Have you shown a copy of the exhibit to the witness?

PLAINTIFF'S COUNSEL: I'm sorry?

THE COURT: Have you shown a physical copy of --

PLAINTIFF'S COUNSEL: I have not. I was going to put it on the screen.

THE COURT: You can't do that until the witness identifies what it is.

PLAINTIFF'S COUNSEL: Okay.

THE COURT: And then we ask [Defendant's counsel] if he has any objection to it. Because even if [he] has no objection to it, if the witness can't authenticate it, meaning she has no idea what it is, it could be problematic.

(Day 1 Trial Tr. at 122:7–16.) This exchange was followed by multiple minutes of Plaintiff's counsel attempting, unsuccessfully, to present the witness a digital copy of the exhibit for verification purposes, (*id.* at 122:22–123:15), a disruptive process which notably included the direct involvement of Plaintiff herself, (*id.* at 119:5–10), who functioned as counsel's *de facto* courtroom technician/paralegal throughout the trial.[9] Given this prolonged delay, the Court interjected to provide the witness with its own copy. (*See id.* at 123:16–17 (THE COURT: "Here is what I'm going to do. I'm going to give a hard copy to the witness.")). When Plaintiff's technological issues persisted, resulting in protracted delays between the verification of an exhibit and the publication of the exhibit to the jury early in the trial, the Court advised "both sides . . . to have hard copies of the exhibits for the witnesses" going forward. (Day 2 Trial Tr. at 14:6–8.) Plaintiff, however, neglected to bring exhibit copies for multiple witnesses in the subsequent trial days, which naturally required the Court to furnish the witnesses with a hard copy of the exhibit.

[9] Plaintiff's role as her counsel's *de facto* courtroom technician/paralegal is apparent throughout the trial transcript. (*See, e.g.*, Day 1 Trial Tr. at 119:5–10; Day 2 Trial Tr. at 24:23–25:8, 108:16–17, 169:14, 173:8–9, 176:19, 200:7; Day 3 Trial Tr. at 44:9, 112:4, 119:6–7, 169:13–170:1, 171:10, 173:9–13, 206:22–24, 210:10–22.) After numerous instances of Plaintiff audibly communicating with her counsel or Defendant's counsel regarding exhibits and matters related to courtroom audio/visual presentations, the Court instructed Plaintiff and her counsel that their logistical communications needed to be conducted privately and out of earshot of the jury. (*See* Day 5 Trial Tr. at 57:5–12 (THE COURT: "[P]laintiff is serving as an assistant to you technologically, which is fine. But she cannot speak and articulate. . . . [S]he testified yesterday and I'm concerned that she's continuing to speak up quite audibly in open court in front of the jury and me. If she needs to advise you . . . logistically, that's one thing. But she needs to do it . . . privately.").)

(*See, e.g.*, Day 3 Trial Tr. at 30:20–21 (THE COURT: "I'm going to give [the witness] a copy, my copy."), 65:7–9 (PLAINTIFF'S COUNSEL: "[I] [d]on't have a physical copy for the witness." THE COURT: "I'll give the witness my physical copy."), 109:24–10:2 (THE COURT: "Do you have a copy of this document for the [witness]?" PLAINTIFF'S COUNSEL: "I don't." THE COURT: "Sir, here is a hard copy.").)

Other supposedly improper interjections follow the same pattern of the Court intervening to keep the trial progressing or, where necessary, to provide instructive guidance to Plaintiff's counsel. In one instance, for example, after sustaining four consecutive objections to Plaintiff's counsel's leading form of question, the Court initiated a sidebar *sua sponte* to advise counsel as to how to properly rephrase his question in a non-objectionable manner. (Day 5 Trial Tr. at 129:2–131:5.) In other instances, the Court would intervene during a line of questioning because Plaintiff's counsel had failed to lay the requisite foundation. (*See, e.g.*, Day 1 Trial Tr. at 33:1–34:20; Day 2 Trial Tr. at 47:9–16; Day 3 Trial Tr. at 56:9–10, 65:24–68:5.) Additionally, the Court did intervene, on occasion, regarding the Rules of Evidence. In one instance, the Court advised Plaintiff's counsel that one of Plaintiff's fact witnesses—their daughter, who happened to be a second-year medical student and who admitted she had yet to study the subject matter in medical school—could not retrospectively proffer *de facto* expert psychiatric testimony, which she claimed she gleaned from some unspecified graduate school project she conducted while obtaining a master's degree, and apply same to things she observed as a 15-year old. (*See* Day 2 Trial Tr. at 128:1–30:2.) Any notion that this exchange—prompted by counsel—is evidence of some insidious grand strategy of the Court designed to undermine Plaintiff is without basis.

There is also a more fundamental problem with Plaintiff's claims of bias. That is, many of the Court's interventions would not have been necessary had Plaintiff simply complied with the

Court's June 4, 2026 pretrial order. Relevant here, that order required the parties to provide a joint exhibit list by August 3, 2026 identifying "all stipulated exhibits that may be received without objection" and "all remaining exhibits with a one-line statement of the legal bases for any objection." (ECF No. 161 ¶ 2(d)(i).) Plaintiff failed to do so. (*See* Day 1 Trial Tr. at 146:7–10 (THE COURT: "There have been pronounced, protracted delays with the jury because [you have] not provided the Court with an exhibit list, though you were under court order to do so.").) On the second day of trial, Plaintiff again neglected to provide a compliant exhibit list, prompting the Court to walk through the basic requirements of the exhibit list and to order counsel, once again, to provide a correct exhibit list by the next day. (Day 2 Trial Tr. at 6:13–15 (THE COURT: "I am ordering you now, again, by tomorrow morning when you come in, you will have an updated exhibit list that comports with the Court issued order way back in June.").) After multiple months of notice, successive reminders during pretrial conferences, and verbal orders on the first two days of trial, Plaintiff finally submitted her final exhibit list on the third day of trial. (Day 3 Tial Tr. at 2:20–3:6.) However, in a fitting conclusion, the exhibit list was printed in the wrong orientation, cutting off multiple columns and making it functionally unusable. (*Id.* at 3:7–16.)

In summary, these "ordinary efforts at courtroom administration" do not support an appearance of a lack of impartiality, *Liteky*, 510 U.S. at 556; *Butt*, 999 F.3d at 891, and they do not entitle Plaintiff to a new trial under Rule 59(a). Thus, the Motion must be denied.

## CONCLUSION

For the reasons set forth above, Plaintiff's Motion is **DENIED**. An appropriate Order accompanies this Memorandum Opinion.

ROBERT KIRSCH
UNITED STATES DISTRICT JUDGE

Dated: November 18, 2026.